UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 16-10017-RWZ

RONALD GAUTREAU

v.

HOPKINTON PUBLIC SCHOOLS, CATHY MacLEOD,
ROBERT BERLO, ALAN KELLER, and MARY ANN DeMELLO[1]

MEMORANDUM OF DECISION

April 19, 2018

ZOBEL, S.D.J.

Plaintiff Ronald Gautreau brings this age discrimination case against his former employer, Hopkinton Public Schools, and four of its administrators. Aged 43 when the district hired him in 2002, plaintiff taught a middle school woodshop course for years without incident. Then, in 2014, his position was reduced to part-time status, and he accepted a full-time position with another school. Plaintiff, a resident of New Hampshire, claims that the reduction amounted to a constructive discharge and that defendants' action violated the Massachusetts statute prohibiting discrimination based on age. Mass. Gen. Laws ch. 151B ("ch. 151B"). He exhausted administrative remedies and brought the instant suit in state court. Defendants removed to this court based on diversity jurisdiction and have moved for summary judgment. (Docket # 32).

---

[1] Though originally pleaded as "Ann Marie DiMello," defendant's name is properly captioned above.

1

I.   **Factual Background**[2]

I summarize the relevant facts in the light most favorable to plaintiff, the nonmoving party.  See Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 172 (1st Cir. 2015).

   A.   **Disciplinary History**

Defendants hired plaintiff in 2002, when he was 43 years old, for the position of middle school engineering/technology teacher; he also served as boys' basketball coach.  Plaintiff was at all relevant times a member of the local teachers' association, and the terms of his employment were negotiated in accordance with a collective bargaining agreement.  Defendant Keller became the middle school principal beginning in the 2010-2011 school year, and his relationship with plaintiff soon grew contentious.  In February of 2011, Keller placed the first of several "memoranda of understanding" ("MOU") in plaintiff's personnel file.  Defendants used MOUs, signed by both parties, "to document a discussion between an evaluator and an educator regarding a verifiable, serious concern."  Docket # 33-2, at 67.

In the first such documented incident, plaintiff chastised several students for damaging a classroom display they had been instructed not to touch.  The students reported that plaintiff had left the classroom to take a phone call, during which time they were unsupervised and damaged the display.  When plaintiff returned and saw the damage, he threw the rest of the display to the ground, "slammed" a wooden drawing board on a desk such that debris flew into a student's face, and called the offending students "idiots."  Accompanied by his union representative, plaintiff met with Keller and

---

[2]   The facts are derived from the parties' Statements of Undisputed Facts and responses thereto (Docket # 39) and all documents filed therewith.

denied leaving the classroom, calling the students "idiots," or doing anything more forceful than "firmly placing" the wooden board on the desk. Although plaintiff filed a responsive letter disputing the MOU, he did not grieve it.

The next dispute arose over plaintiff's parking behavior. In October 2011, Keller forbade any staff from parking in front of the special education building, because those spots were needed for visitors. In November 2012, plaintiff nonetheless parked there to unload classroom supplies from his truck, and was disciplined for doing so. No other teachers were disciplined for parking violations.

Also in November 2012, plaintiff received another MOU, his second. This memo disciplined plaintiff for asking that students provide him with a video of a recent on-campus student fight, which plaintiff admits he did. School administrators had, prior to plaintiff's request, instructed students to delete and refrain from sharing any such video.

The next memorandum, dated January 14, 2013, was styled a "counseling memo," and addressed a parent's complaint that plaintiff had sold sports memorabilia to her son in December 2012. See Docket # 33-2, at 89. Plaintiff admitted having done so, and arranged to return the money and retrieve the item sold. Counseled that such a transaction created a clear conflict of interest, plaintiff nonetheless maintains that other teachers (of indeterminate age) sold jewelry, tutoring sessions, and music lessons without consequence. Keller knew of no teachers other than plaintiff who sold anything to students.

Also in January 2013, plaintiff incurred a third MOU. This one documented various unsafe conditions observed by defendants Keller and Assistant Superintendent DeMello and the (non-party) interim superintendent during a January 8 classroom visit.

They noticed during that visit a lack of eye protection during a woodcutting activity, no posted safety rules, a student cutting an unsecured board, and others walking freely through work areas. As a result, Keller — with DeMello's support — informed plaintiff on January 9 that before he could resume use of power equipment in the classroom, he would be required to take a remedial safety course; reinstruct students in equipment safety; post safety rules; and pass a safety inspection. The safety inspection was conducted by the director of technical education at a nearby vocational high school and an OSHA-certified carpentry teacher at that school. Neither was an expert in classroom safety, and no other classrooms were inspected. Plaintiff grieved this MOU, which Keller investigated and denied; plaintiff then initiated a Level II grievance, the resolution of which is unclear from the record.

Yet another MOU soon followed. Dated February 7, 2013, this fourth and final memo stemmed from a parent complaint Keller received concerning comments plaintiff allegedly made to her child. After the child burned herself with a glue gun for a second time in plaintiff's class, she alleged that plaintiff explained to her that a "cutter" was someone who deliberately engages in self-harm, and inquired whether she was doing so with the glue gun. Plaintiff denies these comments.

Keller concedes that the only other teacher to receive as many MOUs as plaintiff was also between 45 and 55 years old.[3]

### B. Curricular Shift: Project Lead the Way

Programmatic shifts at the school for the 2013-2014 academic year exacerbated mounting tensions between plaintiff and Keller. Administrators decided to implement a

---

[3] Plaintiff additionally relies on the undisputed fact that Keller terminated the only other technical education teacher, who was also over the age of fifty.

new technology education curriculum called "Project Lead the Way" ("PLTW") which would move from more traditional woodshop activities to emphasize engineering and design concepts. The interim superintendent had successfully implemented PLTW in his previous school district and, along with defendants DeMello and Keller, determined that its content was better aligned to state science standards. Keller, with then-Director of Secondary Education Berlo, presented the proposal to the superintendent and school committee, who approved it.

Plaintiff resisted the change, stressing the value to students of hands-on learning. Keller responded "to the effect that" plaintiff's methods "might have been good when you first started teaching, but that's old school," and characterized PLTW as "the way of the future." Docket # 33-2, at 9 (Gautreau Deposition). Defendants paid plaintiff to attend PLTW training in the summer of 2013; although they did not ordinarily compensate staff for professional development, they did so in this instance to appease plaintiff, who had not expected to have to relinquish his regular summer job.

On August 28, 2013, as school staff prepared for students' return, plaintiff met with defendants Berlo and Keller to discuss implementation of the new PLTW curriculum. Until that meeting, plaintiff had operated under the misapprehension that he would implement the new curriculum only with grade 6 students, but be permitted to continue his prior projects with grades 7 and 8. When defendants clarified their expectation that all students learn PLTW, plaintiff became extremely agitated and verbally reminded himself not to be insubordinate. He paced throughout the classroom, clenching and unclenching his hands, and spoke rapidly in sometimes disorganized fashion. As a result, defendant Superintendent MacLeod placed plaintiff on paid

5

administrative leave pending medical clearance for his return, and he resumed classroom duties about a week later.

### C. Reduction in Force and Aftermath

Based on the 2012-2013 standardized test results, the state downgraded the middle school's performance designation. Administrators understood the lowest performers to be among special education students, and thus prioritized more staffing supports for that subgroup in the coming year. See Docket #33-6, at 12–13 (MacLeod Deposition) ("we really had to take a close look at the programs that were being offered and make some decisions around increasing special education opportunities within [Keller's] current budget allocation."); Docket #33-7, at 90 (Berlo Deposition) ("in order to add more support [for special education], there had to be a position within the middle school that could fund this additional support person.")

Plaintiff learned in January 2014 that he would again be expected to attend summer PLTW training, but would not this time be paid. Then, on May 27, 2014, he received a layoff notice as part of a reduction in force attributed to fiscal constraints in the 2015 budget. On the same date, defendants offered plaintiff a part-time position teaching PLTW to sixth-graders only, at a dramatically reduced salary. Plaintiff initially accepted, but informed defendants on August 6, 2014 that he had accepted a position with another district and would not be returning for the 2014-2015 year. The staff member who ultimately assumed the reduced PLTW responsibilities was a woman significantly younger than plaintiff; though her age is not established in the record, Berlo described her as "in the front end of her career." Docket # 33-7, at 96.

## II. Legal Standard

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' for purposes of summary judgment if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' and a 'material fact' is one which 'might affect the outcome of the suit under the governing law.'" Poulis-Minott v. Smith, 388 F.3d 354, 363 (1st Cir. 2004) (quoting Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 (1st Cir. 1993)). In determining whether a genuine issue of material fact exists, "a court must view the evidence 'in the light most favorable to the opposing party.'" Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (per curiam) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).

Although summary judgment is disfavored in cases of disparate treatment because the ultimate issue of discriminatory intent is a factual question, Blare v. Husky Injection Molding Sys. Boston, Inc., 646 N.E.2d 111, 114 (Mass. 1995), "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (quoting Medina–Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

## III. Discussion

Plaintiff contends that Keller targeted him because of his age; that each disciplinary action was a separate instance of discrimination; and that they cumulatively resulted in his constructive discharge. Defendants respond that a budgetary reduction

7

in force enacted pursuant to a valid collective bargaining agreement is not discriminatory as a matter of law, and that the district properly exercised its discretion to prioritize special education spending. I begin with a threshold timeliness issue before following the familiar burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

### A. Timeliness

Under ch. 151B, the Massachusetts anti-discrimination statute, plaintiffs must file any complaint "within 300 days after the alleged act of discrimination." Mass. Gen. Laws. ch. 151B, § 5. "Although the limitations clock generally starts with the commission of a discriminatory act, a true 'continuing violation' rewinds the clock for each discriminatory episode along the way." Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 183 (1st Cir. 1989).

Here, plaintiff filed a complaint with the Massachusetts Commission Against Discrimination on February 24, 2015. It is undisputed that the May 2014 reduction in force is within the 300-day window. Defendants argue, however, that any alleged adverse actions preceding the reduction in force are too remote in time to constitute a continuing course of conduct. In the light most favorable to plaintiff at summary judgment, the court assumes without deciding that plaintiff has timely pleaded a continuing violation beginning in 2011.

### B. Age Discrimination

#### 1. Burden Shifting Framework

Discrimination cases arising under ch. 151B of the Massachusetts law are governed by the tripartite order of proof articulated in McDonnell Douglas. Koster v.

8

Trans World Airlines, Inc., 181 F.3d 24, 30 (1st Cir. 1999); Blare, 646 N.E.2d at 114. Under that standard, a plaintiff whose employment is terminated generally establishes a prima facie case of discrimination by showing that he (1) is a member of a class protected by ch. 151B; (2) performed his job at an acceptable level; (3) was terminated; and that (4) his employer sought to fill his position by hiring a similarly qualified individual. Sullivan v. Liberty Mut. Ins. Co., 825 N.E.2d 522, 531 (Mass. 2005). In a reduction in force case, however, the fourth element is "nonsensical": "the plaintiff is not replaced, nor does [his] employer 'seek to fill' the position, for the very purpose of a workforce reorganization is generally to reduce the number of employees." Id. An employee terminated pursuant to a reduction in force, then, must produce "some evidence that [his] layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination." Id. at 533-34. This requirement has also been framed as a showing that the employer "did not treat age neutrally." Brennan v. GTE Government Sys. Corp., 150 F.3d 21, 26 (1st Cir. 1998).

"The plaintiff's initial burden to establish a prima facie case of discrimination is not onerous. All that is needed is the production of admissible evidence which, if uncontradicted, would justify a legal conclusion of discrimination." Id. (citations omitted). By eliminating the most common nondiscriminatory reasons for the adverse action, the prima facie case entitles the plaintiff to a presumption of unlawful discrimination. Sullivan, 825 N.E.2d at 532-33. To rebut this presumption, federal law only requires that the employer articulate a legitimate nondiscriminatory reason for the adverse action, while Massachusetts law additionally requires that the proffered reason be credible. Martin v. Envelope Div. of Westvaco Corp., 850 F. Supp. 83, 92–93 (D.

9

Mass. 1994); see Dunn v. Trustees of Boston Univ., 761 F.3d 63, 71 (1st Cir. 2014). Once the employer produces such a reason, the presumption of discrimination generated by the employee's prima facie case disappears. Koster, 181 F.3d at 30.

At the third stage, the burden shifts back to the plaintiff to show that the employer's proffered reason is pretextual; "the ultimate question becomes whether, on all the evidence of record, a rational factfinder could conclude that age was a determining factor in the employer's decision." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824–25 (1st Cir. 1991). To this end, a plaintiff may avail himself of such circumstantial proof as "statistical evidence showing disparate treatment by the employer of members of the protected class, comments by decisionmakers which denigrate those over forty, the incidence of differential treatment in the workplace, and the deployment of younger replacements." Id. at 824 (citations omitted).

### 2. Analysis

#### a. Prima Facie Case

As set forth above, to establish a prima facie case of age discrimination in the reduction in force context, plaintiff must show that he is a member of a protected class who performed his job adequately and was laid off in circumstances raising a reasonable inference of unlawful discrimination. Sullivan, 825 N.E.2d at 533-34. It is undisputed that as a person over the age of forty, plaintiff is a member of a protected class. At summary judgment, defendants also do not challenge plaintiff's job performance. The only contested element, then, is whether the circumstances of the reduction in force permit an inference of discriminatory animus.

Defendants make much of the Sullivan court's view that "mere termination of a competent employee when an employer is making cutbacks due to economic necessity is insufficient to establish a prima facie case." 825 N.E.2d at 533. The First Circuit has likewise "rejected the argument that an employer's delegation of duties to other individuals not in [the plaintiff's] protected class amount[s] to retaining individuals in the same position so as to make out a prima facie case of discrimination under either federal or Massachusetts law." Dunn, 761 F.3d at 69. In the light most favorable to plaintiff, however, I have already accepted his allegation that this was not a mere termination, but rather a series of allegedly adverse actions culminating in constructive discharge. Accordingly, the inquiry turns on whether plaintiff's disciplinary history casts a sufficient shadow over the reduction in force to entitle him to the presumption of discrimination engendered by the prima facie case.

Plaintiff essentially argues that Keller targeted him because of his age, and each instance of discipline manifested that unlawful animus. That argument largely rests on unsupported allegations of disparate treatment, leaving only the following age-related evidence to implicate the rest: (1) Keller terminated the other technical education teacher, who was also over the age of fifty; (2) he disparaged plaintiff's pedagogy as "old school," in contrast with his characterization of PLTW as "the way of the future"; (3) the only other teacher to receive as many MOUs as plaintiff was also 45-55 years old; and (4) the woman who assumed plaintiff's reduced duties was significantly younger than plaintiff. This evidence would permit a reasonable jury to conclude that plaintiff's layoff, "if otherwise unexplained, [is] more likely than not based on impermissible factors." Sullivan, 825 N.E.2d at 536. Though thin, these allegations thus raise a

11

sufficient specter of discrimination to establish a prima facie case. See, id. at 534 (plaintiff's initial burden "is meant to be a 'small showing' that is 'easily made'") (quoting Che v. Massachusetts Bay Transp. Auth., 342 F.3d 207, 213 (1st Cir. 2003)).

### b. Legitimate, Nondiscriminatory Reason

Satisfied that plaintiff has established his prima facie case, I look to defendants to proffer a legitimate, nondiscriminatory, and credible reason for the course of conduct culminating in plaintiff's reduction in force. Disputing the premise that any MOU amounts to an adverse action, defendants justify the reduction in force as conducted pursuant to a valid collective bargaining agreement, for budgetary reasons, to strengthen special education so as ultimately to earn back the middle school's top performance designation. This is enough to rebut the presumption of discrimination, which now vanishes. See Sullivan, 825 N.E.2d at 538 (nondiscriminatory reasons for layoff satisfy burden of production at second stage, where employer is free to determine which employees "would best meet its ongoing business needs, provided it did not make the selection for impermissible reasons"); see also Martin, 850 F. Supp. at 93 (employer offered legitimate nondiscriminatory reason for terminating employee as part of reduction in force by indicating that employee's position was eliminated as part of elimination of entire unit, which was necessitated by effort to reduce fixed costs, notwithstanding fact that many of employee's former tasks were still performed by retained employees).

### c. Pretext

Without the benefit of the presumption raised by his prima facie case, the burden now returns to the plaintiff to raise a triable issue of fact on the ultimate question of

whether defendants' articulated reason was pretext for unlawful discrimination. See Dunn, 761 F.3d at 72.

The record clearly chronicles plaintiff's deteriorating relationship with Keller, but contains scant evidence of discrimination animating that deterioration. As outlined above, plaintiff offers four pieces of age-related evidence and argues that the reduction in force was not truly budgetary because defendants failed to consider cuts in better-staffed departments. I address each in turn.

First, the colleague's non-renewal does little to advance plaintiff's cause. Even statistics showing that a reduction in force disproportionately impacts older employees have limited probative value at this stage, when they do not respond to the employer's proffered reason and fail to eliminate other explanations such as random chance and distribution of aptitude. Sullivan, 825 N.E.2d at 541. Here, Keller's non-renewal of plaintiff's colleague occurred independent of, and indeed fully three years before, the reduction in force affecting plaintiff. Moreover, the diminution of the school's technical education department is entirely consistent with the emphasis on standardized test performance undergirding the ultimate reduction in force.

Second, plaintiff points to Keller's dismissal of his "old school" teaching style in favor of "the way of the future" as evidence of ageist bias. But the First Circuit and Supreme Judicial Court have consistently held that such comments do not alone show animus. Id. at 536 n.24 (supervisor's alleged remarks that employee "was not adapting to new ways of doing business," was "stuck in the old ways," and was "part of the old guard," did not establish discriminatory animus, where such "[r]emarks are facially ambiguous and may reflect managerial concerns regarding an employee who declines

13

to adapt to changed business practices, rather than [the manager's] preference for more youthful workers"); Thomas v. Sears, Roebuck & Co., 144 F.3d 31, 33–34 & n. 1 (1st Cir. 1998) (supervisor's comments that employee "had been around too long" and "wasn't able to change," made in response to his "outspoken . . . disagreement with [defendant's] change in business policy," were not "a coded allusion cloaking age discrimination" and thus made "no showing that" the defendant's stated reason for terminating the plaintiff during a restructuring was pretextual under Massachusetts law). Cf. Blare, 646 N.E.2d 111,118 (in combination with comparator evidence, supervisor asking whether plaintiff was "getting too old" to "handle" his duties sufficed to show animus).

Third, because plaintiff has introduced no evidence about the other teacher over age forty who received an equivalent number of MOUs, that employee has no utility as a comparator. Like the non-renewed colleague discussed above, this teacher helps plaintiff raise an inference of discrimination at the prima facie stage, but does nothing now to rebut defendants' proffered nondiscriminatory reason or illustrate impermissible intent.

Plaintiff's argument that he was "replaced" by a younger employee is also unavailing. A discharged employee "is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 846 (1st Cir. 1993) (quoting Barnes v. Gencorp Inc., 896 F.2d 1457, 1465 (6th Cir. 1990)). Plaintiff was offered a position representing a 70% reduction in his former role and consisting of PLTW instruction just

14

to sixth graders; only after he declined did a younger colleague assume those duties. Cf. Martin, 850 F. Supp. at 92 (sufficient evidence that proffered reduction in force was pretextual where employer decided to fire plaintiff before deciding to eliminate his unit, stated reason for closing the unit was inconsistent with its growth, and unit was surreptitiously revived and staffed by younger people).

Finally, plaintiff argues that if defendants' concerns were purely fiscal, they would have pruned the larger music or foreign language departments before eliminating the school's sole technical education position. Even if so, "[the court's] task is not to evaluate the soundness of [defendants'] decision making, but to ensure it does not mask discriminatory animus." Sullivan, 825 N.E.2d at 541. See Mesnick, 950 F.2d at 825 ("Courts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions").

In sum, plaintiff's contentious history with Keller does not without more amount to evidence of discriminatory animus. See id. at 826 ("Regardless of its bulk, [plaintiff's] evidence had nothing at all to do with age or with the employer's true motives . . . Viewed singly or in combination, these fragments would not allow a rational jury to find that [employer] had a hidden, age-oriented agenda."). Where plaintiff has failed to rebut defendants' proffered nondiscriminatory explanation, summary judgment for defendants is appropriate.

### IV. Conclusion

Defendants' Motion for Summary Judgment (Docket # 32) is ALLOWED.

| April 19, 2018 | /s/Rya W. Zobel |
|---|---|
| DATE | RYA W. ZOBEL<br>SENIOR UNITED STATES DISTRICT JUDGE |